133 Ill.2d 33 (1989)
549 N.E.2d 292
In re ESTATE OF LONGEWAY (Bonnie Keiner, Appellant,
v.
Community Convalescent Center, Appellee).
No. 67318.
Supreme Court of Illinois.
Opinion filed November 13, 1989.
Rehearing denied January 29, 1990.
*34 *35 Rev. Eugene P. Parnisari, of Naperville, for appellant.
Thomas J. Cisar, Peter P. Gaddy and Mary A. Jennings, of Cisar & Gaddy, of Oak Brook, for appellee.
John Grotto, of Grotto & Van Der Molen, of Wheaton, for the guardian ad litem.
Fenella Rouse, Elena N. Cohen and M. Rose Gasner, of New York, New York (Richard Wasserman, of Zavin, Sinnreich & Wasserman, of New York, New York, of counsel), and Lawrence R. Samuels, of Ross & Hardies, of Chicago, all for amicus curiae Society for the Right to Die, Inc.
Kirk B. Johnson, Edward B. Hirshfeld and Terrie A. Rymer, of Chicago, and Carter G. Phillips, Mark E. Haddad and Joseph R. Guerra, of Sidley & Austin, of Washington, *36 D.C., for amicus curiae American Medical Association.
Reversed and remanded.
JUSTICE RYAN delivered the opinion of the court:
Bonnie Keiner, daughter and guardian of the estate and person of Dorothy M. Longeway, petitioned the circuit court of Du Page County to enter an order permitting her to withdraw the artificially administered nutrition and hydration currently sustaining her mother. Community Convalescent Center, the nursing facility where Longeway now resides, intervened and filed a motion to dismiss. The court granted this motion, and we agreed to hear a direct appeal of this dismissal pursuant to Supreme Court Rule 302(b) (107 Ill.2d R. 302(b)). We reverse and remand.
Beginning in 1976, Dorothy M. Longeway suffered a series of strokes and other illnesses which eventually rendered her unconscious. According to the guardian's petition, Longeway, now 76 years old, has lost all personality, memory, purposeful action, social interaction, thought and emotion, due to severe brain damage. Her prognosis is very poor; although she is not medically "brain dead," the neurological damage is so extensive that she will never regain consciousness. Longeway cannot communicate, but opens her eyes and responds to verbal commands and painful stimuli. She breathes without assistance, but cannot chew or swallow, and requires a surgically implanted gastrostomy tube to receive food and water.
The guardian's petition alleged that Longeway, while still conscious and competent, indicated on several occasions that she did not wish to be kept alive by a machine or device, and would rather die naturally than linger. She did not, however, execute a living will (see Ill. Rev. Stat. 1987, ch. 110 1/2, par. 701 et seq.) or a health care power of attorney (see Ill. Rev. Stat. 1987, ch. 110 1/2, *37 par. 804-1 et seq.). The guardian urged that the gastrostomy tube be withdrawn from Longeway, seeking this relief in two counts: that the guardian be allowed to substitute her judgment for that of her incompetent mother or, alternatively, that she be allowed to make this decision as being in the best interests of her mother.
The circuit court summarily dismissed the "best interests" count, but set a hearing date on the "substituted judgment" count. The court may have felt that substituted judgment was an acceptable procedure for dealing with terminally ill incompetent patients because of the recent appellate court decision in In re Estate of Prange (1988), 166 Ill. App.3d 1091. This court subsequently vacated the appellate court decision in Prange and dismissed the appeal in this court after the patient's death. (In re Estate of Prange (1988), 121 Ill.2d 570.) When informed of our action in Prange, the circuit court then cancelled the scheduled hearing and dismissed the substituted-judgment count. The guardian appeals the dismissal of both counts.
The issue in this case is whether the guardian of an incompetent, seriously ill patient may exercise a right to refuse artificial nutrition and hydration on behalf of his ward and, if so, how this right may be exercised.
A number of State courts have addressed the question of whether life-sustaining measures may be withdrawn from incompetent patients: Arizona (Rasmussen v. Fleming (1987), 154 Ariz. 207, 741 P.2d 674), California (Barber v. Superior Court (1983), 147 Cal. App.3d 1006, 195 Cal. Rptr. 484), Connecticut (Foody v. Manchester Memorial Hospital (Super. 1984), 40 Conn. Supp. 127, 482 A.2d 713), Delaware (Severns v. Wilmington Medical Center, Inc. (Del. Ch. 1980), 425 A.2d 156), Florida (John F. Kennedy Memorial Hospital, Inc. v. Bludworth (Fla. 1984), 452 So.2d 921), Georgia (In re L.H.R. (1984), 253 Ga. 439, 321 S.E.2d 716), Louisiana *38 (In re P.V.W. (La. 1982), 424 So.2d 1015), Maine (In re Gardner (Me. 1987), 534 A.2d 947), Massachusetts (Superintendent of Belchertown State School v. Saikewicz (1977), 373 Mass. 728, 370 N.E.2d 417), Minnesota (In re Torres (Minn. 1984), 357 N.W.2d 332), Missouri (Cruzan v. Harmon (Mo. 1988), 760 S.W.2d 408), New Jersey (In re Quinlan (1976), 70 N.J. 10, 355 A.2d 647), New York (In re Storar (1981), 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266), Ohio (Leach v. Akron General Medical Center (1980), 68 Ohio Misc. 1, 426 N.E.2d 809), and Washington (In re Hamlin (1984), 102 Wash.2d 810, 689 P.2d 1372). In addition, at least one Federal case concerned this issue. (Gray v. Romeo (D.R.I. 1988), 694 F. Supp. 580.) With the exception of Missouri, the courts in the cases cited above are unanimous in allowing the withdrawal of life-sustaining medical procedures under appropriate circumstances. At least eight State courts have considered specifically the removal of nutrition and hydration: California (In re Drabick (1988), 200 Cal. App.3d 185, 245 Cal. Rptr. 840), Florida (Corbett v. D'Alessandro (Fla. App. 1986), 487 So.2d 368), Maine (In re Gardner (Me. 1987), 534 A.2d 947), Massachusetts (Brophy v. New England Sinai Hospital, Inc. (1986), 398 Mass. 417, 497 N.E.2d 626), Missouri (Cruzan v. Harmon (Mo. 1988), 760 S.W.2d 408), New Jersey (In re Jobes (1987), 108 N.J. 394, 529 A.2d 434), New York (Delio v. Westchester County Medical Center (1987), 129 A.D.2d 1, 516 N.Y.S.2d 677; but see In re O'Connor (1988), 72 N.Y.2d 517, 531 N.E.2d 607, 534 N.Y.S.2d 886), and Washington (In re Grant (1987), 109 Wash.2d 545, 747 P.2d 445). Again, with the exception of Missouri, and New York in In re O'Connor, all the jurisdictions cited have permitted artificial nutrition and hydration to be withdrawn from certain types of patients.
The courts which have grappled with the issue of "the right to die," or as it is often termed, "the right to *39 refuse life-sustaining medical treatment," have found themselves thrust into a realm where law, medicine, and religion intersect. Advancements in medical science have redefined death from a cessation of pulse and respiration (Black's Law Dictionary 488 (4th ed. 1968)) to a cessation of brain activity (see In re Haymer (1983), 115 Ill. App.3d 349; Ill. Rev. Stat. 1987, ch. 110 1/2, par. 302(b)). Hopelessly or terminally ill patients who in the past would have met with a swift end, now find that medical science can sustain them, near the threshold of death, but not yet across it. "Advances in this area are occurring with such rapidity that science has outstripped the ability of society to develop an ethical base for dealing with problems caused by new possibilities." (In re L.H.R. (1984), 253 Ga. 439, 445, 321 S.E.2d 716, 722.) The role of the judiciary in this area is an uncertain one. Frequently, the courts are not consulted at all. There is reliable information that for many years, members of a patient's family, together with doctors and clergy, have made decisions to withdraw life-sustaining equipment from incompetent, hopelessly ill patients without seeking judicial approval. (See In re Storar (1981), 52 N.Y.2d 363, 385, 420 N.E.2d 64, 75, 438 N.Y.S.2d 266, 277 (Jones, J., dissenting) (citing survey of physicians showing that 61% believe their colleagues practice euthanasia).) The judiciary is viewed as ill suited to resolve these situations which involve complex medical procedures, diverse religious views, and a need for quick decisionmaking.
The problem becomes more acute when dealing with artificial nutrition and hydration. Food and water are emotionally symbolic in that food and water are basic necessities of life, and the feeding of those who are unable to feed themselves is the most fundamental of all human relationships. (See In re Grant (1987), 109 Wash.2d 545, 559-60, 747 P.2d 445, 453.) Also, the removal of food and *40 water causes death from dehydration, which can be an unpleasant experience, as one justice, in dissent, noted:
"Removal of the G tube would likely create various effects from the lack of hydration and nutrition, leading ultimately to death. Brophy's mouth would dry out and become caked or coated with thick material. His lips would become parched and cracked. His tongue would swell, and might crack. His eyes would recede back into their orbits and his cheeks would become hollow. The lining of his nose might crack and cause his nose to bleed. His skin would hang loose on his body and become dry and scaly. His urine would become highly concentrated, leading to burning of the bladder. The lining of his stomach would dry out and he would experience dry heaves and vomiting. His body temperature would become very high. His brain cells would dry out, causing convulsions. His respiratory tract would dry out, and the thick secretions that would result could plug his lungs and cause death. At some point within five days to three weeks his major organs, including his lungs, heart, and brain, would give out and he would die. The judge found that death by dehydration is extremely painful and uncomfortable for a human being. The judge could not rule out the possibility that Paul Brophy could experience pain in such a scenario. Paul Brophy's attending physician described death by dehydration as cruel and violent." (Brophy v. New England Sinai Hospital, Inc. (1986), 398 Mass. 417, 444 n. 2, 497 N.E.2d 626, 641 n. 2 (Lynch, J., dissenting in part).)
Persistently comatose patients, however, are said to lack the capacity to feel pain and suffering, thus ameliorating concerns of a horrifying death. (American Academy of Neurology, Position of the American Academy of Neurology on Certain Aspects of the Care and Management of the Persistently Vegetative State Patient (Adopted April 21, 1988).) If indeed they feel no pain, the concern about these patients then shifts to the prospect of remaining comatose and sustained by artificial feeding for long periods of time until death finally occurs. (See Brophy, 398 *41 Mass. at 437, 497 N.E.2d at 637 (longest recorded survival in this manner is 37 years); Cruzan v. Harmon (Mo. 1988), 760 S.W.2d 408, 411 (comatose 30-year-old woman sustained by gastrostomy tube could live 30 years).) Faced with this dilemma, the courts, with the aid of the medical profession, have attempted to look beyond the symbolism of food and water to assess the artificial nature of delivering sustenance to these patients.
Artificial nutrition and hydration is considered a medical life-prolonging treatment by the American Medical Association. In a recent ethics opinion, the AMA states:
"Even if death is not imminent but a patient's coma is beyond doubt irreversible and there are adequate safeguards to confirm the accuracy of the diagnosis and with the concurrence of those who have responsibility for the care of the patient, it is not unethical to discontinue all means of life-prolonging medical treatment. Life-prolonging medical treatment includes medication and artificially or technologically supplied respiration, nutrition or hydration." (Emphasis added.) (American Medical Association Council on Ethics & Judicial Affairs, Opinion 2.18 (1986).)
Artificial nutrition and hydration are also considered as death-delaying procedures in the Living Will Act (Ill. Rev. Stat. 1987, ch. 110 1/2, par. 702(d)) and as health care in the Powers of Attorney for Health Care Law (Ill. Rev. Stat. 1987, ch. 110 1/2, pars. 804-10(a), (b)(1)).
State courts which have allowed nutrition and hydration to be withdrawn from incurably ill patients have agreed that nasogastric tubes, gastrostomies, or intravenous infusions are medical treatments and therefore analytically distinguishable from spoon-feeding or bottle-feeding. (See, e.g., In re Conroy (1985), 98 N.J. 321, 372-73, 486 A.2d 1209, 1236; Delio v. Westchester County Medical Center (1987), 129 A.D.2d 1, 18-19, 516 N.Y.S.2d 677, 688-89; Corbett v. D'Alessandro (Fla. App. *42 1986), 487 So.2d 368, 371; In re Grant (1987), 109 Wash.2d 545, 559-62, 747 P.2d 445, 452-54; In re Gardner (Me. 1987), 534 A.2d 947, 954-55.) Termination of these intrusive procedures does not deprive the patient of life; rather, the inability of the patient to chew or swallow, as a result of his illness, is viewed as the ultimate agent of death. (Delio, 129 A.D. at 23-24, 516 N.Y.S.2d at 692; Brophy, 398 Mass. at 439, 497 N.E.2d at 638.) Consequently, the consensus opinion treats artificial nutrition and hydration as a medical treatment and analyzes the problem of its withdrawal accordingly. We agree with this view, and next must turn to the question of whether a patient has the right to refuse this type of treatment.
The seminal case which addressed the issue of withdrawing life-sustaining medical procedures was In re Quinlan (1976), 70 N.J. 10, 355 A.2d 647. In that case, 22-year-old Karen Ann Quinlan was in a comatose, persistently vegetative state. The New Jersey Supreme Court allowed Quinlan's father, acting as her guardian, to direct the removal of life-supporting apparatus. (Artificial nutrition and hydration, however, were not removed.) Although Quinlan's father asserted several different constitutionally based theories in support of the relief requested, the court found that the right to refuse treatment was premised on the constitutional right of privacy.
Other theories which the Quinlan court considered and rejected included the constitutional rights of free exercise of religion (U.S. Const., amend. 1) and freedom from cruel and unusual punishment (U.S. Const., amend. VIII). Subsequent decisions allowing the refusal of life-sustaining medical treatment have been premised upon Federal privacy rights (In re L.H.R. (1984), 253 Ga. 439, 321 S.E.2d 716), State constitutional guarantees of privacy (Corbett v. D'Alessandro (Fla. App. 1986), 487 So.2d 368), *43 State common law (Delio, 129 A.D.2d 1, 516 N.Y.S.2d 677), or various provisions in State guardianship statutes (In re Drabick (1988), 200 Cal. App.3d 185, 245 Cal. Rptr. 840). Drawing upon this background, the guardian in the case before us contends that Mrs. Longeway's right to discontinue nutrition and hydration is grounded in Federal and Illinois constitutional privacy rights, common law, and the Illinois Probate Act.
Examining the Federal right of privacy, we note that this right is not explicitly mentioned in the United States Constitution. Nevertheless, the Supreme Court held in Griswold v. Connecticut (1965), 381 U.S. 479, 14 L.Ed.2d 510, 85 S.Ct. 1678, that a constitutional right of privacy exists in penumbras emanating from the various guarantees in the Bill of Rights. Constitutional privacy, however, encompasses only personal rights which are fundamental or implicit in the concept of ordered liberty (Roe v. Wade (1973), 410 U.S. 113, 152, 35 L.Ed.2d 147, 176, 93 S.Ct. 705, 726), or which are "`deeply rooted in this Nation's history and tradition.'" (Bowers v. Hardwick (1986), 478 U.S. 186, 192, 92 L.Ed.2d 140, 146, 106 S.Ct. 2841, 2844, quoting Moore v. City of East Cleveland (1977), 431 U.S. 494, 503, 52 L.Ed.2d 531, 540, 97 S.Ct. 1932, 1938.) The Supreme Court has never ruled on whether the right of privacy guarantees a right to refuse medical care. In fact, in Roe, the Court noted that the right of privacy is not absolute, and rejected the idea that "one has an unlimited right to do with one's body as one pleases." (Roe, 410 U.S. at 154, 35 L.Ed.2d at 177, 93 S.Ct. at 739.) Moreover, the Supreme Court recently declined to expand the number of rights deemed fundamental and therefore protected by the zone of privacy. Bowers, 478 U.S. at 194-95, 92 L.Ed.2d at 148, 106 S.Ct. at 2846 (holding that homosexual acts are not constitutionally protected).
*44 Lacking guidance from the Supreme Court, we decline to address whether Federal privacy guarantees the right to refuse life-sustaining medical treatment. Lacking a clear expression of intent from the drafters of our 1970 State constitution, we similarly abstain from expanding the privacy provision of our State constitution to embrace this right. (See Ill. Const. 1970, art. I, § 6 ("[t]he people shall have the right to be secure in their persons * * * against * * * invasions of privacy * * *").) Instead, we follow the wisdom of the Supreme Court in avoiding constitutional questions when the issue at hand may be decided upon other grounds. (Rescue Army v. Municipal Court (1947), 331 U.S. 549, 568-69, 91 L.Ed. 1666, 1678, 67 S.Ct. 1409, 1419-20.) In the present case, we find a right to refuse life-sustaining medical treatment in our State's common law and in provisions of the Illinois Probate Act.
Under common law, a patient normally must consent to medical treatment of any kind. Consent is required to maintain the right of personal inviolability: "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." (Union Pacific Ry. Co. v. Botsford (1891), 141 U.S. 250, 251, 35 L.Ed. 734, 737, 11 S.Ct. 1000, 1001.) Viewing this right in the context of medical treatment, Justice Cardozo stated, "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." (Schloendorff v. Society of New York Hospital (1914), 211 N.Y. 125, 129-30, 105 N.E. 92, 93.) This court has held that informed consent is a prerequisite to surgery. (Pratt v. Davis (1906), 224 Ill. 300.) *45 Lacking consent, a physician cannot force medical care upon a patient, even in life-threatening situations. (Cf. In re Estate of Brooks (1965), 32 Ill.2d 361 (right to refuse life-saving treatment found in first amendment free exercise of religion clause).) Exceptions to the doctrine of informed consent do exist, for example, in emergency situations (6A C.J.S. Assault & Battery § 7 (1975)) or when a minor needs care (see, e.g., Ill. Rev. Stat. 1987, ch. 111, pars. 4502, 4503).
Furthermore, because a physician must obtain consent from a patient prior to initiating medical treatment, it is logical that the patient has a common law right to withhold consent and thus refuse treatment. This right incorporates all types of medical treatment, including life-saving or life-sustaining procedures. Many of our sister States have based the right to refuse life-sustaining treatment wholly or partly on this common law basis. (See, e.g., Conroy, 98 N.J. 321, 486 A.2d 1209; Storar, 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266; Drabick, 200 Cal. App.3d 185, 245 Cal. Rptr. 840; Rasmussen, 154 Ariz. 207, 741 P.2d 674; Gardner, 534 A.2d 947.) We find the reasoning of these opinions persuasive, and hold that in Illinois, the common law right to refuse medical treatment includes, under appropriate circumstances, artificial nutrition and hydration.
Because we are concerned here not with the right of a patient's personal refusal of medical treatment, but rather with the exercise of this common law right through a surrogate, we must examine relevant provisions of the Probate Act to see if a guardian may act as that surrogate. We find that the Probate Act impliedly authorizes a guardian to exercise the right to refuse artificial sustenance on her ward's behalf. Section 11a-17 of the Probate Act specifically permits a guardian to make provisions for her ward's "support, care, comfort, health, education and maintenance." (Ill. Rev. Stat. *46 1987, ch. 110 1/2, par. 11a-17.) Moreover, if the patient previously executed a power of attorney under the Powers of Attorney for Health Care Law (Ill. Rev. Stat. 1987, ch. 110 1/2, par. 804-1 et seq.), that act permits her to authorize her agent to terminate the food and water that sustain her (Ill. Rev. Stat. 1987, ch. 110 1/2, par. 804-10). If a health care agency is in force, and a court appoints a guardian to handle other matters for the ward, the Probate Act specifically provides that the guardian has "no power, duty or liability with respect to any * * * health care matters covered by the agency." (Ill. Rev. Stat. 1987, ch. 110 1/2, par. 11a-17(c).) Logically, the legislature would not have prohibited the guardian from usurping the authority of an agent acting under a health care power of attorney, if the guardian could not have exercised the agent's powers in the first place. Thus, if only an agent can terminate food and water under a power of attorney, the Probate Act would not have precluded a guardian from interfering with this prerogative, unless the guardian also would have this power.
It is argued that a guardian cannot have this power because of this court's decision in In re Marriage of Drews (1986), 115 Ill.2d 201. In Drews, we held that a guardian had no standing to file suit to dissolve her ward's marriage, finding nothing in the Probate Act that "grants [a] guardian standing to maintain or defend any legal proceeding." (Emphasis in original.) (Drews, 115 Ill.2d at 206.) Here, however, the guardian is not instituting a legal proceeding or suit on behalf of a ward, but is merely petitioning the court for authority to perform an act which is within the implied authority granted by the Probate Act. Consequently, we find Drews inapposite to the case at bar and hold that a guardian may exercise the right to refuse artificial sustenance on behalf of a ward in accordance with the guidelines discussed below.
*47 The first step in allowing an incompetent patient to refuse artificial nutrition and hydration through a surrogate is to define, as best we can, what kind of an incompetent patient is eligible for surrogate exercise of this right. First, we wish to state emphatically that we do not condone suicide or active euthanasia in this State. Accordingly, an incompetent patient must be terminally ill before his right to refuse artificial sustenance may be exercised. We note that the Living Will Act (Ill. Rev. Stat. 1987, ch. 110 1/2, par. 702(h)) defines "terminal condition" as an incurable and irreversible condition which is such that death is imminent and the application of death-delaying procedures serves only to prolong the dying process. We find that it is appropriate to apply this definition to the requirement we have just stated that the incompetent patient must be terminally ill. Second, such patient must be diagnosed as irreversibly comatose, or in a persistently vegetative state. Although neurologists are the most adept at defining these terms and will reliably diagnose each patient on a case-by-case basis, the reported testimony of a physician in Brophy is illustrative:
"A physician who performed a neurological evaluation of Brophy testified that a persistent vegetative state is a condition in which the patient:
`(a) shows no evidence of verbal or non-verbal communication;
(b) demonstrates no purposeful movement or motor ability;
(c) is unable to interact purposely with stimulation provided by his environment;
(d) is unable to provide for his own basic needs;
(e) demonstrates all of the above for longer than three months.'" (Brophy, 398 Mass. at 421 n. 4, 497 N.E.2d at 628 n. 4.)
Finally, the accuracy of the diagnosis must be safeguarded. Consequently, the patient's attending physician *48 along with at least two other consulting physicians must concur in the diagnosis. See Foody, 40 Conn. Supp. at ___, 482 A.2d at 721.
The next step is to balance an eligible patient's right to discontinue sustenance against any interests the State may have in continuing it. The cases identify four countervailing State interests: "(1) the preservation of life; (2) the protection of the interests of innocent third parties; (3) the prevention of suicide; and (4) maintaining the ethical integrity of the medical profession." (Superintendent of Belchertown State School v. Saikewicz (1977), 373 Mass. 728, 741, 370 N.E.2d 417, 425.) Normally, none of these interests will override a patient's refusal of artificially administered food and water. Adequate safeguards exist to protect life and third parties, and to prevent suicide. Moreover, the ethical integrity of the medical profession can be ensured by not compelling (by court order or any other means) any medical facility or its staff to act contrary to their moral principles. The patient can be transferred to a different facility or a new physician can be appointed to carry out the patient's wishes, if the current staff or physician cannot. See Brophy, 398 Mass. at 439-41, 497 N.E.2d at 638-39.
The next step is to detail how the patient's wishes can be ascertained. Obviously, a patient who is irreversibly comatose or in a vegetative state will be incompetent, unable to communicate his intent. The courts have generally employed one of two theories in ascertaining an incompetent patient's wishes: "best interests" or "substituted judgment."
The best-interests approach has been utilized by several courts dealing with this issue. (See, e.g., Drabick, 200 Cal. App.3d. 185, 245 Cal. Rptr. 840; Rasmussen, 154 Ariz. 207, 741 P.2d 674; Torres, 357 N.W.2d 332.) Under the best-interests test, a surrogate decisionmaker chooses for the incompetent patient which medical procedures *49 would be in the patient's best interests. The criteria used include "relief from suffering, preservation or restoration of functioning, and quality and extent of sustained life." (Rasmussen, 154 Ariz. at 222, 741 P.2d at 689.) The problem with the best-interests test is that it lets another make a determination of a patient's quality of life, thereby undermining the foundation of self-determination and inviolability of the person upon which the right to refuse medical treatment stands. A dilemma arises, of course, when the patient is an infant or lifelong incompetent who never could have made a reasoned judgment about his quality of life. While not passing on the viability of the best-interests theory in Illinois, we decline to adopt it in this case because we believe the record demonstrates the relevancy of the substituted-judgment theory. Furthermore, the substituted-judgment theory has already been implicitly adopted in Illinois by our legislature in the Powers of Attorney for Health Care Law. The Law states: "Your agent will have authority * * * to obtain or terminate any type of health care, including withdrawal of food and water * * * if your agent believes such action would be consistent with your intent and desires." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 110 1/2, par. 804-10.
Under substituted judgment, a surrogate decisionmaker attempts to establish, with as much accuracy as possible, what decision the patient would make if he were competent to do so. Employing this theory, the surrogate first tries to determine if the patient had expressed explicit intent regarding this type of medical treatment prior to becoming incompetent. (See In re O'Connor (1988), 72 N.Y.2d 517, 531 N.E.2d 607, 534 N.Y.S.2d 886.) Where no clear intent exists, the patient's personal value system must guide the surrogate:
"`[E]ven if no prior specific statements were made, in the context of the individual's entire prior mental life, including *50 his or her philosophical, religious and moral views, life goals, values about the purpose of life and the way it should be lived, and attitudes toward sickness, medical procedures, suffering and death, that individual's likely treatment/nontreatment preferences can be discovered. Family members are most familiar with this entire life context. Articulating such knowledge is a formidable task, requiring a literary skill beyond the capacity of many, perhaps most, families. But the family's knowledge exists nevertheless, intuitively felt by them and available as an important decisionmaking tool.'" Jobes, 108 N.J. at 415, 529 A.2d at 445, quoting Newman, Treatment Refusals for the Critically Ill: Proposed Rules for the Family, the Physician and the State, 3 N.Y.L. Sch. Hum. Rts. Ann. 45-46 (1985).
Actual, expressed intent of a desire to have artificial sustenance withdrawn is what the New York Court of Appeals required in the recent decision, In re O'Connor (1988), 72 N.Y.2d 517, 531 N.E.2d 607, 534 N.Y.S.2d 886. There, the court held that "despite its pitfalls and inevitable uncertainties, the inquiry must always be narrowed to the patient's expressed intent, with every effort made to minimize the opportunity for error." (O'Connor, 72 N.Y.2d at 530, 531 N.E.2d at 613, 534 N.Y.S.2d at 892.) The concurring opinion, however, criticizes this specific-subjective-intent rule, stating that what it requires is factually impossible because there is no way to determine what the actual, present intent of an incompetent patient is. Moreover, the concurrence states that the result in O'Connor under the specific-subjective-intent rule and under a substituted-judgment test would be the same. Consequently, we find that although actual, specific express intent would be helpful and compelling, the same is not necessary for the exercise of substituted judgment by a surrogate. In this case, Mrs. Longeway's guardian must substitute her judgment for that of Longeway's, based upon other clear and convincing evidence *51 of Longeway's intent. The guidelines quoted above from Jobes should aid in ascertaining Longeway's desires and in reaching a decision. On remand, the court should not hesitate to admit any reliable and relevant evidence if it will aid in judging Longeway's intent.
The final step in a patient's exercise of the right to refuse life-sustaining treatment is to determine the role of the court. The majority of the cases addressing the issue do not specifically require a court order to withdraw artificial life support. (Rasmussen, 154 Ariz. 207, 741 P.2d 674; Drabick, 200 Cal. App.3d 185, 245 Cal. Rptr. 840; Jobes, 108 N.J. 394, 529 A.2d 434; Storar, 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266; contra In re P.V.W. (La. 1982), 424 So.2d 1015.) Nevertheless, we feel that to halt artificial sustenance, the intervention of a judge is proper for several reasons.
First, Illinois has a strong public policy of preserving the sanctity of human life, even if in an imperfect state. (Siemieniec v. Lutheran General Hospital (1987), 117 Ill.2d 230, 249.) "`Health care professionals serve patients best by maintaining a presumption in favor of sustaining life, while recognizing that competent patients are entitled to choose to forego any treatments, including those that sustain life.'" (In re Farrell (1987), 108 N.J. 335, 351, 529 A.2d 404, 412, quoting President's Commission for the Study of Ethical Problems in Medicine and Bio-medical & Behavioral Research, Deciding to Forego Life Sustaining Treatment 3 (1983).) Because we agree that a presumption exists favoring life, we find that scrutiny by a judge is appropriate in these cases. Furthermore, since the key element in deciding to refuse or withdraw artificial sustenance is determining the patient's intent, we require proof of this element by clear and convincing evidence. Accord Rasmussen, 154 Ariz. 207, 741 P.2d 674; P.V.W., 424 So.2d 1015; Gardner, 534 A.2d 947; A.2d 947; Storar, *52 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266; Leach, 68 Ohio Misc. 1, 426 N.E.2d 809.
Second, court intervention is necessary to guard against the remote, yet real possibility that greed may taint the judgment of the surrogate decisionmaker. (See generally Drabick, 200 Cal. App.3d at 218, 245 Cal. Rptr. at 861.) We stress that the record in the case before us reveals no such problems and we do not imply that greed is present here. We can foresee other cases, however, where the surrogate decisionmaker stands to profit from the patient's demise and covets ill-gotten wealth to the point of fatal attraction. Generally, no penetrating investigation will be required. Nevertheless, the judge is free to inquire as to the beneficiaries and extent of the patient's estate, if it appears necessary to do so.
Third, the courts have a parens patriae power which enables them to protect the estate and person of incompetents. (Quinlan, 70 N.J. at 44, 355 A.2d at 666; 27 Am.Jur.2d Equity § 69 (1966).) Moreover, if the surrogate decisionmaker is a court-appointed guardian, procedural due process questions involving deprivation of life may arise. (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2.) Although it is uncertain whether sufficient State action is present to invoke the protections of procedural due process, utilizing a court to oversee the guardian's decision as to the termination of artificial nutrition and hydration will forestall any potential constitutional infirmities.
We recognize that some will consider court intervention objectionable. The medical profession may rightfully resent judicial intrusion into its domain. The slow, deliberate nature of the court system may frustrate the family and loved ones of the patient. Although we feel that the courts can act expeditiously in clear-cut uncontested cases, we acknowledge these objections and the difficulty in reaching a balanced approach to this dilemma. For *53 this reason, we, like most courts that have pondered these issues, invite the legislature to address this problem. (Accord Rasmussen, 154 Ariz. 207, 741 P.2d 674; L.H.R., 253 Ga. 439, 321 S.E.2d 716; P.V.W., 424 So.2d 1015; Farrell, 108 N.J. 335, 529 A.2d 404; Storar, 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266; Grant, 109 Wash.2d 545, 747 P.2d 445.) Because we believe the right to refuse artificial sustenance is premised on common law and not necessarily constitutionally based, the legislature is free to streamline, tailor, or overrule the procedures outlined in this opinion to the extent that no constitutional doctrine is abrogated. The legislature is the appropriate forum for the ultimate resolution of the questions surrounding the right to die:
"Legislatures are also considered to be better suited than courts to set guidelines in this area. Legislatures may be better able to balance the interests involved in determining whether to permit termination of care, and they have the power to make laws and regulations for the protection of the public health and welfare. In addition, the delicate ethical considerations involved in making a `right to die' decision may require a legislative determination, as the legislature has the job of weighing and understanding social interaction. Finally, it is argued that legislatures directly represent the people and thus are best able to determine social policy." Brown, Therefore, Choose Death, 10 Hum. Rts. J. 39, 44 (1982).
Our legislature has peripherally addressed the question before us in both the Living Will Act (Ill. Rev. Stat. 1987, ch. 110 1/2, par. 701 et seq.) and the Powers of Attorney for Health Care Law (Ill. Rev. Stat. 1987, ch. 110 1/2, par. 801-1 et seq.). However, neither a living will nor a health care power of attorney is involved in this case. Therefore, neither law is helpful, except as it may reflect legislative intent or public policy. The Living Will Act specifically includes intravenous feeding and tube feeding as death-delaying procedures which, under the *54 direction of a living will, may be withdrawn. However, the Living Will Act provides that nutrition and hydration may not be withdrawn or withheld if the withdrawal or withholding would result in death solely from dehydration or starvation, rather than from the existing terminal condition. Ill. Rev. Stat. 1987, ch. 110 1/2, par. 702(d).
In the Powers of Attorney for Health Care Law, it is specifically authorized that food and water and other life-sustaining measures may be withdrawn (Ill. Rev. Stat. 1987, ch. 110 1/2, pars. 804-10(a), (b)(1)) without any limitation on the exercise of that power, if death would result solely from dehydration or starvation rather than the existing terminal condition. Thus, it cannot be said that the limitation on the withdrawal of nutrition and hydration in the Living Will Act expresses the public policy of this State and prohibits all such withdrawal if it would result in death solely from dehydration or starvation, rather than from the existing terminal condition, because, as noted, the Powers of Attorney for Health Care Law contains no such limitation on the power of the agent to withdraw food and water. Furthermore, the Powers of Attorney for Health Care Law specifically provides that that law prevails over all inconsistent acts and "[i]f the principal has a living will * * * the living will shall not be operative so long as an agent is available who is authorized by a health care agency to deal with the subject of life-sustaining or death-delaying procedures for and on behalf of the principal." Ill. Rev. Stat. 1987, ch. 110 1/2, par. 804-11.
In 1988, House Bill 4094 was introduced in the General Assembly. This was a new act not referring to or amending the Living Will Act or the Powers of Attorney for Health Care Law. House Bill 4094 created a presumption that nutrition and hydration are to be given unless refused by the patient while competent, with certain *55 exceptions. Whether or not this bill was meant to be an expression of legislative intent that the policy of this State does not permit the withdrawal of nutrition or hydration, as is sought in the case before us, is not clear from the language of the bill, or from the legislative debates. In any event, the bill was defeated.
We therefore find no law or expression by the legislature of public policy which prohibits the exercise of the power of the guardian to withdraw nutrition and hydration in this case. We acknowledged above that the legislature is in a better position than are the courts to resolve the sensitive issues presented in this case. However, we have this case before us for decision and we must decide it in light of the law and the public policy which now exists. We cannot defer to the legislature for some possible future expression from that body as to public policy, which may or may not be forthcoming. As we have read the present law and the expression of the General Assembly as to public policy, as noted above, we see nothing which would prohibit the guardian from acting in the manner directed in this opinion.
Until legislative action directing otherwise, however, any exercise of the common law right to refuse or withdraw artificial nutrition and hydration by a surrogate must follow the guidelines of this opinion. Consequently, the decision of the trial court in this case is reversed, and the cause remanded for further proceedings consistent with this opinion.
Reversed and remanded.
JUSTICE CALVO took no part in the consideration or decision of this case.
JUSTICE WARD, dissenting:
In human terms the most awesome of this court's responsibilities is judging whether the imposition of the *56 death penalty following a criminal trial should be carried out. Our legislature has authorized the imposition of that penalty and no one would suggest that in the absence of that legislative empowerment, this court could direct the taking of the life of the most depraved criminal. Justice Clark in his dissent convincingly observes that, not only has the legislature not authorized the withdrawal of life-sustaining food and fluids for the purpose of causing death, but in express terms has prohibited it in the absence of conditions not present here. Cases like this are among the most melancholy in the human experience, but the agony of deciding does not give license to act without, and even more, to act in disregard of, the legislative will.
Today's holding will of course reach beyond Mrs. Longeway. A public guardian in an appeal before this court which closely resembles this case has acknowledged that several thousand Illinois residents are disabled by conditions related to age, traumatic injury or congenital defect and require tube-feeding. These persons comprise one of the most vulnerable groups in our society. A recent Federal survey reports that 19.4% of all patients in Illinois' 237 intermediate care facilities and 33.8% of all residents in this State's skilled nursing homes receive tube-feeding or need assistance to obtain sustenance. (Health Standards & Quality Bureau, United States Health Care Financing Administration, Medicare/Medicaid Nursing Home Information 87/88, 1 Report on Illinois 1, 4 (Dec. 1, 1988).) The number of these patients in Mrs. Longeway's condition and who are under comparable circumstances is unknown.
In cases where abortion is the issue the inquiry is when the protection of being a human begins; here, in a real sense, the majority determines that a third person may judge when that protection has been lost by an incompetent person. That determination results from the *57 majority's holding that an incompetent person has a common law right to refuse artificial nutrition and hydration and that, as an expedient, I suggest, it is said that this right may be exercised by a third person substituting for the incompetent person. The majority states:
"Under substituted judgment, a surrogate decisionmaker attempts to establish, with as much accuracy as possible, what decision the patient would make if he were competent to do so." 133 Ill.2d at 49.
The determination of whether there is a common law right to withdraw or withhold life-sustaining treatment from an incompetent patient must be measured from a consideration of the nature of the right a competent patient possesses to accept or reject medical care. The right of a competent adult to refuse medical treatment is anchored in the common law doctrine which requires the patient's informed consent to the administration of medical care. The doctrine of informed consent developed as a means of protecting an individual's right to self-determination and personal independence in making decisions of great personal importance. Under the doctrine, a physician may be held civilly liable if a medical procedure is performed upon a competent adult patient without the patient's consent. (In re Storar (1981), 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266.) The doctrine of informed consent presupposes that the patient has the information necessary to make an informed decision and is able to evaluate that information. Thus, to make an "informed" decision to accept or refuse treatment, the patient must have a full understanding of the nature of the illness and the prognosis, the information necessary to evaluate the risks and benefits of all the available treatment options, and the competency to make a reasoned and voluntary decision. (In re Conroy (1985), 98 N.J. 321, 347, 486 A.2d 1209, 1222, quoting Wanzer, Adelstein, Cranford, Federman, Hook, Moertel, Safar, Stone, *58 Taussig & Van Eys, The Physician's Responsibility Toward Hopelessly Ill Patients, 310 New Eng. J. Med. 955, 957 (1984).) In the absence of these prerequisites, a person cannot make an informed decision to consent to or to refuse a particular form of treatment. In re Conroy, 98 N.J. at 347, 486 A.2d at 1222; Cruzan v. Harmon (Mo. 1988), 760 S.W.2d 408.
The majority simply assumes, without discussion, that the common law right to refuse medical treatment applies to all persons, whether or not they are competent to exercise that right. In doing so, the majority fails to consider fundamental distinctions between competent and incompetent patients. It must be said that the majority of courts that have held as the majority does here have ignored this troublesome problem and have said that the common law right to refuse life-sustaining treatment survives becoming incompetent. (See, e.g., Superintendent of Belchertown State School v. Saikewicz (1977), 373 Mass. 728, 741, 370 N.E.2d 417, 423; Jobes, 108 N.J. at 426-27, 529 A.2d at 451; Gardner, 534 A.2d at 952.) There are constitutional scholars, however, who have rejected the notion that the right to refuse treatment applies equally to competent and incompetent patients.
For example, Professor Laurence Tribe observed that conceptual and practical difficulties arise when one attributes "rights" to patients who are irreversibly comatose or in a chronic vegetative state. He observed that, while such patients are not dead in any legal sense, it is difficult to give content to the notion that they have rights in the face of the recognition that they cannot make decisions about how to exercise such rights. L. Tribe, American Constitutional Law 936-37 (1978).
Tribe, of course, was not suggesting that incompetent persons do not have any rights. He simply recognized what is the basic flaw in the view of the majority and *59 other courts that have spoken of the incompetent patient's "right" to refuse life-sustaining treatment. In the effort to support the incompetent patient's "right to choose" to refuse life-sustaining treatment, the majority does not consider that the right to refuse treatment is rooted in and dependent upon the patient's capacity for informed decision, which an incompetent patient, of course, does not possess.
Undaunted by conceptual and practical difficulties which arise when one speaks of a "right to refuse medical care" in the case of incompetent persons, the majority simply assumes that incompetent patients must be considered the same as competent patients in regard to the right to refuse life-sustaining treatment. As incompetent patients are incapable of making a choice or giving consent, the majority would confer the power to choose and consent to third parties through the fiction of substituted consent.
The Quinlan court was the first to authorize third persons to terminate life-sustaining treatment from an incompetent ward under the notion of substituted consent. (In re Quinlan (1976), 70 N.J. 10, 355 A.2d 647.) There, 22-year-old Karen Ann Quinlan was living in a "non-cognitive, vegetative" state. (Quinlan, 70 N.J. at 41, 355 A.2d at 664.) Karen's father sought judicial permission to disconnect the respirator that assisted his daughter's breathing, making several different constitutional arguments in support of the asked-for relief. The court, stating that the right to refuse treatment was premised on Karen's constitutional right of privacy, held that Karen had the right to decide to terminate her vegetative existence. Quinlan, 70 N.J. at 41, 355 A.2d 664.
Regarding Karen's inability to decide whether to exercise this right, the court stated:
"The only practical way to prevent destruction of the right is to permit the guardian and family of Karen to *60 render their best judgment * * * as to whether she would exercise it in these circumstances." 70 N.J. at 41, 355 A.2d at 664.
The court authorized her father to direct the removal of life-support systems. (Quinlan, 70 N.J. at 42, 355 A.2d at 664.) Although her physicians believed that Karen could not survive without the respirator, she lived for nine years after it had been disconnected. (Artificial nutrition and hydration were not removed. When asked if he wanted Karen's nasogastric feeding tube removed, her father replied, "Oh no, that is her nourishment." Ramsey, Prolonged Dying: Not Medically Indicated, 6 Hastings Cent. Rep. 14 (1976).)
The court's constitutional analysis, as well as its use of the substituted-judgment and substituted-consent doctrines, have been strongly criticized. Professor Tribe has suggested that, rather than effectuating Karen Quinlan's "rights," the court gave constitutional status to her family's desire to be rid of their torment and the interest of society in freeing medical decisionmakers from blind adherence to a practice of keeping vegetative persons alive out of fear of prosecution. L. Tribe, American Constitutional Law 936-37 (1978).
Professor Yale Kamisar's criticism of the Quinlan decision focused upon the court's invocation of the substituted-consent doctrine. He has suggested that Quinlan provided "euthanasia proponents with something that has eluded them for decades  the bridge between voluntary and involuntary euthanasia, between the `right to die' and the `right to kill.'" (Kamisar, A Life Not (or No Longer) Worth Living: Are We Deciding the Issue Without Facing It? (Nov. 10, 1977), Mitchell Lecture delivered at the State University of New York at Buffalo, quoted in Note, Due Process, Privacy & the Path of Progress, 1979 U. Ill. L.F. 469, 518 n. 239.) Kamisar also criticized the court's willingness to guess at what Karen *61 Quinlan would want if she could decide for herself. "What the court is really saying, I believe, is that if Karen's constitutional right of privacy includes a right to elect to die and that she presently lacks the capacity to choose and we cannot discern from her previous statement how she as a particular individual would have chosen, we may surmise that she would have chosen to die because we presume that the great majority of those in her situation would so choose." (Emphasis in original.) (1979 U. Ill. L.F. at 518 n. 238.) Kamisar continues: "If, in the absence of hard evidence about a patient's wishes when actually put in a Quinlan-type situation, a court is to indulge in presumptions, one would think that it would presume just the opposite of what it did in Quinlan." (Emphasis in original.) 1979 U. Ill. L.F. at 518 n. 238.
Courts permitting, despite criticism of Quinlan, a third party to exercise the right to refuse life-sustaining treatment on behalf of the incompetent ward have adopted one of three grounds to define when the third party may exercise a patient's right to refuse treatment: the best interests, the substituted judgment or the subjective intent of the patient. The majority opinion explains and here adopts the substituted-judgment ground.
The substituted-judgment approach is appealing because it purports to preserve the incompetent patient's personal right of self-determination and bodily integrity. The analysis, however, is based upon a legal fiction: that the incompetent patient actually chooses to refuse life-sustaining treatment, and the court and litigants simply effectuate or carry out the patient's intent. Responsibility for the decision to terminate treatment rests with the incompetent patient, while the court and guardian become blameless, choiceless assistants. Weber, Substituted Judgment Doctrine: A Critical Analysis, 1 Issues in L. & Med. 131, 137 (1985).
*62 The majority discusses the termination of life-sustaining treatment under the substituted-judgment approach as though the surrogate will simply effectuate the incompetent patient's intent. Typically, however, there is no direct evidence that the incompetent patient intended to refuse the treatment. Instead, the majority must presume that a surrogate decisionmaker will acquire such intimate knowledge of the patient's basic views or philosophy that the surrogate can formulate a reliable opinion regarding how the incompetent would have reacted to his current predicament even if the incompetent had never previously expressed views upon the subject. (Jobes, 108 N.J. at 438, 529 A.2d at 457.) The majority also seemingly presumes that the choice made by a surrogate is equivalent to the choice the incompetent patient would make if competent. In doing so, the majority ignores the inherent differences between choices made by individuals who are competent and choices made for individuals who are not. Because Mrs. Longeway's incompetent condition makes it impossible to definitively ascertain her present intent toward the withdrawal of nutrition and hydration, allowing a third party to make a substituted judgment on her behalf may violate, rather than exercise, her right to self-determination and to control her own body. As the court in Cruzan v. Harmon (Mo. 1988), 760 S.W.2d 408, which is now before the Supreme Court, noted, "courts seldom indulge the temptation to determine whether one person's autonomy and self-determination can be exercised by another, though the very terms seem to indicate that these rights are not alienable, unless so determined by the person for whom they are exercised." (Cruzan v. Harmon (Mo. 1988), 760 S.W.2d 408, 416 n. 11.) By claiming to preserve the incompetent patient's right to self-determination, the majority is relieved of the burden of acknowledging that it *63 is actually allowing third parties to decide how that right shall be exercised.
Too, risk of error is inherent under the "substituted-judgment" approach, because the surrogate, and ultimately the court that authorizes the termination of nutrition and hydration, must attempt to ascertain the patient's intent from sources external to the incompetent individual. A surrogate and the court must piece together any available testimony from relatives and other sources to construct a persona. They say that that image, if you will, then represents and decides for the incompetent person. The entire effort is more of an exercise in fictional characterization than it is an execution of the patient's intent and rights. (Weber, Substituted Judgment Doctrine: A Critical Analysis, 1 Issues in L. & Med. 131, 137 (1985).) I believe it to be incongruous to say, as the majority does, that the "guardian must substitute her judgment for that of Longeway's, based upon other clear and convincing evidence of Longeway's intent." (133 Ill.2d at 50-51.) If there were clear and convincing evidence of an incompetent's intent, a surrogate's substituted intent and judgment would not be necessary. It has been observed that the substituted-judgment approach "allows the truly involuntary to be declared voluntary, thus bypassing constitutional, ethical and moral questions, and avoiding the violation of taboos. Third party consent is a miraculous creation of the law  adroit, flexible, and useful in covering the unseemly reality of conflict with the patina of cooperation." Price & Burt, Sterilization, State Action, and the Concept of Consent, Law & Psychology Rev. 58 (Spring 1975).
The majority assumes that the substituted judgment to terminate nutrition and hydration will be made, as it will be here, by the patient's loving family. Many elderly persons, however, have few or no surviving relatives or friends and are socially isolated. Too, considerations *64 other than the patient's suggested wish, such as the quality of the patient's life, may intrude upon the decisionmaking. Under substituted judgment, a surrogate may decide that the incompetent patient would not want to live in his present condition. The surrogate arrives at that decision, however, by placing himself in the position of the incompetent patient and then using his own subjective standard and personal value system to judge the incompetent's quality of life. Such a determination is obviously fraught with the danger that the surrogate's decision will reflect the surrogate's value system (or a mistaken view of the incompetent's value system) and be opposed to the patient's personal value system. Because the surrogate is judging the quality of the patient's life on the surrogate's own terms, there is always the risk that the surrogate will allow the patient to die simply because he is incompetent. (Note, Live or Let Die; Who Decides an Incompetent's Fate? In re Storar and In re Eichner, 1982 B.Y.U.L. Rev. 387, 393.) This concern prompted the New York Court of Appeals to reject the "substituted judgment" approach as "inconsistent with our fundamental commitment to the notion that no person or court should substitute its judgment as to what would be an acceptable quality of life for another." (In re O'Connor (1988), 72 N.Y.2d 517, 530, 531 N.E.2d 607, 613, 534 N.Y.S.2d 886, 892.) Allowing a guardian to substitute his judgment for that of an incompetent ward creates a grave risk that due to the guardian's own personal values, biases, or mistaken beliefs concerning the ward, there will be wards who will undergo the death described in frightening terms in the majority opinion, without ever having had such an intent to do so. It is fully understandable that the inherent risks of and the consequences of mistake which necessarily accompany the decision to terminate another person's life-sustaining treatment and take his life have led thoughtful commentators *65 to reject the notion of substituted judgment. See L. Tribe, American Constitutional Law 1369 (1978); Kamisar, Some Non-Religious Views Against Proposed "Mercy-Killing" Legislation, 42 Minn. L. Rev. 969 (1958).
JUSTICE CLARK, also dissenting:
I must emphatically and categorically dissent from what I view as this court's sad foray into the legislative realm, a realm that most certainly does not belong to the members of the judiciary. Although the majority recognizes that the "legislature is the appropriate forum for the ultimate resolution of the questions surrounding the right to die" (133 Ill.2d at 53), they nevertheless refuse to exercise the proper restraint. Rather, they plunge heedlessly and needlessly into the abysmal abyss created by those who attempt to too quickly solve what they perceive to be life's tragedies.
The majority's venture into legislation making is both dangerous and, in this case, utterly unnecessary. Based on even the majority's description of Longeway's condition (i.e., "opens her eyes and responds to verbal commands and painful stimuli" (133 Ill.2d at 36)), under the majority's five-part test, as I read it, a test designed to potentially permit withdrawal of the nasogastric tube, it would seem that Mrs. Longeway does not qualify for withdrawal. Thus the majority has fashioned a remedy that this court and the residents of this State will be required to apply, but which, in all probability, does not do what the majority set out to do: "help this poor patient."
The majority justifies this step into legislation making by implying that the legislature has not to date taken any initiative on this question. The majority contends that "[w]e cannot defer to the legislature for some possible future expression from that body as to public policy, *66 which may or may not be forthcoming." (Emphasis added.) (133 Ill.2d at 55.) I contend, however, that the Illinois legislature has developed a public policy regarding the "right to die" issue; rather than recognize and adhere to that policy, however, the majority of this court would instead jump on the bandwagon of "consensus" (133 Ill.2d at 42). As I will attempt to illustrate, in Illinois this bandwagon is on treacherously shaky ground.
The majority bases its decision that there exists a right to refuse "life-sustaining medical treatment in our State's common law and in provisions of the Illinois Probate Act." (133 Ill.2d at 44.) As the majority properly notes, Longeway did not execute a living will (see Ill. Rev. Stat. 1987, ch. 110 1/2, par. 701 et seq.) or a health care power of attorney (see Ill. Rev. Stat. 1987, ch. 110 1/2, par. 804-1 et seq.); therefore this case does not, strictly speaking, involve application of these statutory provisions. It is well accepted, however, that when legislation and the common law address the same issue (here that issue is the right to refuse treatment, or right to die), "legislation will govern because it is the latest expression of the law." (2A N. Singer, Sutherland on Statutory Construction § 50.01, at 421 (4th ed. 1984).) Additionally well settled is the concept that "[c]onstitutionally valid legislation that is enacted in response to current demands serves as a valuable evidentiary source of public policy." (2A N. Singer, Sutherland on Statutory Construction § 56.02, at 629 (4th ed. 1984).) Both the Living Will Act and the Health Care Power of Attorney Act provide a fertile "source of public policy"; further development and refinement of that public policy ought to be left to the able hands of the legislators, not imposed by the judiciary.
That this issue should be addressed by the legislature as an elected representative body has been recognized not only by this court (133 Ill.2d at 52-53) but has been *67 advocated in numerous cases and commentaries. (In re Conroy (1985), 98 N.J. 321, 486 A.2d 1209; In re Jobes (1987), 108 N.J. 394, 529 A.2d 434; In re Guardianship of Grant (1987), 109 Wash.2d 545, 747 P.2d 445; In re O'Connor (1988), 72 N.Y.2d 517, 531 N.E.2d 607, 534 N.Y.S.2d 886; Cruzan v. Harmon (Mo. 1988), 760 S.W.2d 408.) When dealing with the very breath of human life, haste makes much more than waste, and I, for one, would wait for the legislature to extend any rights beyond those now accorded competent, terminally ill patients. Courts have long recognized that legislatures address issues bit by bit; it is not necessary that a piece of legislation cover every conceivable situation in the first bill that addresses a specific issue placed before the legislature. With this knowledge as part of the background framework for this court's analysis, I do not understand how the majority can conclude that there is "no law or expression by the legislature of public policy" (133 Ill.2d at 55) which addresses the issue before us.
The legislature has indeed confronted the issue of an individual's rights to terminate medical treatment in certain circumstances. In 1983 the legislature passed "An Act to provide for the authorization by terminally ill persons of the discontinuance of medical procedures" (Ill. Rev. Stat. 1987, ch. 110 1/2, par. 701 et seq.), which became effective January 1, 1984. The act is commonly referred to as the Living Will Act. (Ill. Rev. Stat. 1987, ch. 110 1/2, par. 710.) In 1983, the bill creating the Living Will Act passed by a substantial margin; this was in sharp contrast to the first time such a bill had been introduced in the legislature 15 years earlier, when it received one solitary vote. This legislative action, though not controlling in the case before us, provides fertile groundwork for this court's review.
I note that one thing stands out clearly when the legislative debates on the Living Will Act are reviewed: the *68 right involved in choosing to reject certain treatments is a strictly personal right with certain limitations. The right to refuse treatment involves a "voluntary choice made by that person and that person alone." (83d Ill. Gen. Assem., House Proceedings, May 24, 1983, at 137 (statements of Representative Curran).) In describing the bill to his colleagues, Representative Curran stated that a "living will is a legal document whereby a person who is terminally ill and whose death is imminent may, if they and they alone choose, authorize the discontinuance of life sustaining medical treatment where that treatment will serve only to prolong dying." (83d Ill. Gen. Assem., House Proceedings, May 24, 1983, at 137.) Representative Curran recognized that there was some opposition to the living will legislation:
"Those * * * who are opposed to the living will * * * are opposed on the basis that the living will, they believe somewhere down the line, might lead to euthanasia. I believe that is a perception of goblins behind bushes. Euthanasia is Mike Curran making all the decisions about your death. The living will is you making some of the decisions about some of the circumstances of your death. This is not euthanasia." 83d Ill. Gen. Assem., House Proceedings, June 29, 1983, at 203.
Similar concerns were voiced during the Senate debates. In supporting the bill, Senator Sangmeister had this to say:
"Basically what this bill says, is it gives you the right, you, and you only, no one else in your family, just yourself, the right to sign a declaration that says, in part anyway, `If at anytime I should have an incurable injury, disease, or illness judged to be a terminal condition by my attending physician who has personally examined me and is determined that my death is imminent except for life sustaining procedures, I direct that such procedures be withheld or withdrawn and that I be permitted to die naturally with only the administration of medication, sustenance *69 or the performance of any medical procedure deemed necessary to provide me with comfort care.'" (83d Ill. Gen. Assem., Senate Proceedings, June 27, 1983, at 175.)
Senator DeAngelis supported the passage of the bill because, he said, the choice is "being [made] today but it's not being done by the person who should make the ultimate decision"; this bill assures that, rather than the family making the decision, the patient makes his own individual choice. 83d Ill. Gen. Assem., Senate Proceedings, June 27, 1983, at 183.
Four years later (1987) the Living Will Act was amended, with changes effective January 1, 1988. Senate Bill 1147, which effectuated the changes, "satisf[ied] the concerns of the Medical Society and Right-to-Life groups regarding the withholding of nutrition and water." (83d Ill. Gen. Assem., Senate Proceedings, May 12, 1983, at 153.) The primary change occurred in section 2(d), which originally had been titled "Life-sustaining procedure". The original provision read:
"`Life-sustaining procedure' means any medical procedure or intervention which, when applied to a qualified patient, in the judgment of the attending physician would serve only to postpone the moment of death, when death is imminent, except for such procedure or intervention being utilized. `Life-sustaining procedure' shall not include the administration of medication or sustenance or the performance of any medical procedure deemed necessary to provide comfort care or to alleviate pain."
The Act as amended renames the procedure and specifically states that some choices are prohibited:
"`Death delaying procedure' means any medical procedure or intervention which, when applied to a qualified patient, in the judgment of the attending physician would serve only to postpone the moment of death. In appropriate circumstances, such procedures include, but are not limited to, assisted ventilation, artificial kidney treatments, *70 intravenous feeding or medication, blood transfusions, tube feeding and other procedures of greater or lesser magnitude that serve only to delay death. However, this Act does not affect the responsibility of the attending physician or other health care provider to provide treatment for a patient's comfort care or alleviation of pain. Nutrition and hydration shall not be withdrawn or withheld from a qualified patient if the withdrawal or withholding would result in death solely from dehydration or starvation rather than from the existing terminal condition." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 110 1/2, par. 702(d).
The Illinois living will legislation was initially effective over 1 1/2 years prior to the National Conference of Commissioners on Uniform State Laws approval and recommendation of the Uniform Rights of the Terminally Ill Act (URTIA). Though the legislature did not indicate any reliance on URTIA, I note that the amendments made by the Illinois legislature were only enacted after the Commission's recommendations were accepted and URTIA was available for State use.
In a prefatory note to URTIA, the commissioners acknowledged that the scope of the act is narrow; however, in drawing upon existing legislation they drafted an act which, they indicated, was intended to avoid complexity, simplify procedures, improve drafting and clarify language. URTIA defines "Life-sustaining treatment" as "any medical procedure or intervention that, when administered to a qualified patient, will serve only to prolong the process of dying."
Prior to approval of URTIA, the commissioners were apparently faced with questions regarding administration of nutrition and hydration under a definition of "Life-sustaining treatment" and therefore prepared a specific response entitled "Nutrition and Hydration in the Rights of the Terminally Ill Act." Two points raised in that response are of interest:

*71 "Life-sustaining treatment as defined by the Act does not specifically exclude the giving of food and water. (A number of current state acts exclude `nutrition and hydration' so they cannot be classified as life-sustaining procedures). Although the Rights of the Terminally Ill Act does not specifically provide for such an exclusion, it allows food and water to be given (or any other treatment or therapy) `for comfort care or alleviation of pain.' In most circumstances, food and water would be administered because it would be `necessary' for the comfort care of the patient."
In summarizing the points raised, the commissioners concluded:
"Nothing in this Act authorized the starvation and dehydration of extremely handicapped infants, of elderly people both in and out of institutions, or of anybody in a persistent vegetative state. Also, nobody can make a declaration for any other person."
Our legislature, rather than leave the issue of nutrition and hydration to possible ambiguous interpretation, instead unequivocally indicated that it rejected any removal or withdrawal of medical procedures which would lead to death by dehydration or starvation. Thus, while acknowledging that there may be some "appropriate circumstances" in which nutrition and hydration may be withheld, the Illinois legislature made it clear that such circumstances could only be found when the procedure would have no impact upon an already imminent death, not when the removal would actually cause the death by starvation and dehydration. A death by starvation and dehydration is extremely painful (133 Ill.2d at 39-40) and not one which should be cavalierly imposed upon an incompetent individual.
While the majority at one point indicated their conviction that there is no law or public policy that precludes the decision announced today, they inexplicably acquiesced to the fact that, although the Living Will Act is *72 not here involved, "it may reflect legislative intent or public policy." (133 Ill.2d at 53.) So also, I contend, may a defeated bill provide insight into public policy. Sutherland's Statutory Construction addresses just this concept:
"Statute law, like case law, grows through a case by case inclusion and exclusion. When demand for legislative regulation arises, it is seldom that the first few bills on the subject are adopted. Because defeated legislative proposals are seldom given any attention following their defeat, the meaning of this record of negative legislative action goes almost totally unexplored and unexplained. To ignore it is as misleading as would be the rejection from our case law of all decisions for the defendant.
* * *
The study of any field of legislative regulation supports this conclusion. Instead of the sudden, sporadic, and unexpected enactment of unprecedented legislation the ordinary legislative enactment has had many precursors. It expands or restricts the regulation of former acts, but seldom breaks with the principle of regulation expressed by its predecessors.
* * * Thus, an examination of all legislation in a particular field is necessary for a full appreciation of any specific enactment. This consideration must be more inclusive than the literal inquiry of in pari materia; it must probe basic policy and the pattern and development of the means and procedures used to activate that policy. An inquiry of this character can disclose a legislative common law of surprising consistency and continuity. It not only may give meaning to the `legislative intent' of a particular statute but can also pave the way for constructive judicial use of legislative as well as case law precedents." (2A N. Singer, Sutherland on Statutory Construction § 45.10, at 44-45 (4th ed. 1984).)
Obviously, defeated bills are not controlling, but rather merely instructive, useful evidence; thus, a bill that winds its way through three readings in the House and Senate, with full opportunity for vigorous debate, may *73 provide evidence of the "consistency and continuity" which are indicative of legislative trends. In other words, the mere fact of a bill's defeat is not the one and only focus of review. Even in defeat, the legislative debates provide a window through which to view the "mind" of the legislature, a source of insight into the basic policy position of the legislature.
House Bill 4094 was defeated in the Senate, as the majority noted (133 Ill.2d at 54-55). We need not speculate on the reasons why; however, a review of the legislative debates will aid our "full appreciation" of the legislative trend. As the majority noted, House Bill 4094, introduced into the General Assembly in 1988, attempted to create a new act with a "presumption that nutrition and hydration are to be given unless refused by the patient while competent, with certain exceptions." (133 Ill.2d at 54-55.) In supporting the bill before the House (where the bill passed with a vote of 102 ayes, 12 present), Representative Curran indicated that, in his view,
"it coordinates well with the Living Will Act, what it does, I think, is make sure simply that nobody is starved to death or nobody is forced to die of thirst, a pretty horrible way to die, because some physician would individually make that determination. It says that people ought to have the right to nutrition and people ought to have the right to hydration. I think it's a simple concept that back... that basically strengthens the original idea of a living will * * *." (85th Ill. Gen. Assem., House Proceedings, May 19, 1988, at 6.)
When the bill went before the Senate, Senator Poshard spoke in favor of its passage:
"[I]n many instances today, such as serious automobile accidents or trauma cases, individuals cannot speak for themselves and have no living will or power of attorney to have someone speak for them. In these cases, perhaps the individual is in a comatose or a semicomatose state. *74 This particular bill would create the presumption that every person be given food and water to sustain life until the natural body processes cease to function * * *." (85th Ill. Gen. Assem., Senate Proceedings, June 24, 1988, at 73.)
Later in the same session, Senator Poshard indicated that he, by supporting the bill, did not intend or want to:
"sustain life by artificial means, but is water and food artificial? From the time a baby breathes his first breath in this world till the time our natural body processes end our life, two of the most essential nourishing things that any of us can be given is food and water. And all this bill says is that until those natural body processes end naturally, don't hasten the death by starving somebody or dehydrating their body. * * * The presumption here is on the side of life not death, and I ask you today to keep this simple, choose life not death." (85th Ill. Gen. Assem., Senate Proceedings, June 24, 1988, at 89-90.)
While many senators spoke, I will quote only one more in this review. Senator Kelly, in speaking in support of the bill, indicated:
"I think it does improve the... certainly support the quality of life * * *. I do feel that I don't want to die from starvation and from thirst... because this example of what was talked about was one of the... most atrocious and I think it actually reflects upon a... a Hitler type of atmosphere when we allow any human being to be dehydrated, have... I know about the details and it's gory * * *. * * * I think it's important particularly to give protection to those that need the help the most, the... the mentally handicapped and the senior citizens and the people who can't protect themselves." (85th Ill. Gen. Assem., Senate Proceedings, June 24, 1988, at 78-79.)
House Bill 4094 did not go through the normal legislative committee process; this raised a concern for some of the senators, as Senator Rock pointed out in the course of the debates. The vote on the bill in the Senate  26 *75 ayes, 17 nays, and 13 present  failed to receive the required constitutional majority.
Some might counter that these arguments are hollow based on the fact that a House Judiciary Committee, when presented in early May 1989 with a bill said to be similar to House Bill 4094, defeated the bill in committee. A defeat in committee, however, does not provide the same level of information and insight as may be gained from a full debate on the floor of the House or Senate. (See Gerill Corp. v. Hargrove Builders, Inc. (1989), 128 Ill.2d 179, 205-06.) Additionally, I note that the very complexity and gravity of this issue, evidenced by the legislature's continuing struggle, is further support that any expansion or restriction of the right to die must be left to the elected representatives in the legislature.
As the portions of the legislative debates quoted begin to show, the withdrawal of nutrition and hydration is a gravely important issue to the people of this State. Its very life and death importance demands that this court not rush in to "do something for this poor patient" but that the matter be more fully studied and reviewed by the legislature.
Our legislature would not be addressing this issue in a vacuum. The issue of third parties making decisions for incompetent patients has been addressed in the recent work of the drafting committee on amendments to the Uniform Rights of the Terminally Ill Act. The drafting committee has prepared an amendment to the act which would add a new and separate section. The proposed amendment, to be presented to the National Conference of Commissioners on Uniform State Laws during their annual meeting in August 1989, specifically addresses health care decisions made by others when the patient is incompetent.
*76 The majority further contends that a guardian has the power to terminate nutrition and hydration because the guardian must have at least the same powers as an agent and an agent has the power to terminate nutrition and hydration under the Powers of Attorney for Health Care Law (Ill. Rev. Stat. 1987, ch. 110 1/2, par. 804-1 et seq.). (133 Ill.2d at 46.) This is convoluted reasoning at its worst. Even were it not, the Powers of Attorney Law simply does not grant an agent the power the majority asserts. Though the majority does not discuss it, the Powers of Attorney for Health Care Law was amended by Public Act 85-1395, effective September 2, 1988. This bill was moving through the legislature at the same time as defeated House Bill 4094, discussed at length above. House Bill 3598 amended the purpose section of the Powers of Attorney Law to include the following language:
"Nothing in this Act shall be deemed to authorize or encourage euthanasia, suicide or any action or course of action that violates the criminal law of this State or the United States. Similarly, nothing in this Act shall be deemed to authorize or encourage any violation of a civil right expressed in the Constitution, statutes, case law and administrative rulings of this State * * * or the United States or any action or course of action that violates the public policy expressed in the Constitution, statutes, case law and administrative rulings of this State or the United States." (Pub. Act 85-1395, eff. Sept. 2, 1988.)
This same language is incorporated, by explicit reference, through an amendment to section 4-1, the purpose section of the Powers of Attorney for Health Care Law.
Representative McCracken described the amendment as an "agreed Amendment" which "seeks to * * * expressly specify that the Act does not authorize or approve of euthanasia or suicide and that certain other *77 provisions not be construed to give the agent in question, created under the Act, powers which the principal would not have." (85th Ill. Gen. Assem., House Proceedings, May 18, 1988, at 40-41.) Representative McCracken reiterated this thought again, by stating that it "[m]akes certain provisions so that the Act shall not be construed as a public policy approval of euthanasia or suicide * * *." 85th Ill. Gen. Assem., House Proceedings, May 20, 1988, at 141.
The act before this court as we decide this case indicates that under the Powers of Attorney for Health Care Law, the agent has no greater power than the principal. Additionally, the Act stresses that any actions undertaken on behalf of the principal must comport with the "public policy" of the statutes and case law of this State. As has already been elucidated above, the public policy again and again enunciated by the legislature is clearly one of favoring life. Similarly, our case law favors life.
This court addressed the issue of life as opposed to nonlife in Siemieniec v. Lutheran General Hospital (1987), 117 Ill.2d 230. In Siemieniec this court held that there is a strong public policy of preserving "the sanctity of human life, even in its imperfect state." (117 Ill.2d at 249.) The interest in life is no less merely because we are dealing here with those who may be close to the end of life rather than at its very beginning. In Siemieniec this court found persuasive the reasoning of the supreme courts of Idaho, Kansas, Alabama and New Jersey, which each found life precious. (Siemieniec, 117 Ill.2d at 250-51.) That reasoning is still persuasive. See Blake v. Cruz (1984), 108 Idaho 253, 260, 698 P.2d 315, 322 ("Basic to our culture is the precept that life is precious. As a society, therefore, our laws have as their driving force the purpose of protecting, preserving and improving the quality of human existence"); Bruggeman *78 v. Schimke (1986), 239 Kan. 245, 254, 718 P.2d 635, 642 ("Whether the person is in perfect health, in ill health, or has or does not have impairments or disabilities, the person's life is valuable, precious, and worthy of protection"); Berman v. Allan (1979), 80 N.J. 421, 430, 404 A.2d 8, 13 ("No man is perfect. Each of us suffers from some ailments or defects, whether major or minor, which make impossible participation in all the activities the world has to offer. But our lives are not thereby rendered less precious than those of others whose defects are less pervasive or less severe").
In sum, the agent is limited to actions which the principal could take and which would be permissible under the public policy as established in the statutes and case law. Based on the public policy of this State as described above, termination of a life by starvation and dehydration is not a viable choice for an individual to make for himself through a living will executed while competent, let alone to make such a choice for another who is already incompetent. Under the majority's reasoning, if the agent would not have the authority to terminate nutrition and hydration, the guardian would not have that authority either.
That such policy decisions ought not to be made by four, or even seven, individuals on a court of law, but should rather be left to the larger elected legislative branch of government, is supported by a careful reading of history wherein we are reminded repeatedly of the importance of each small step taken in a particular direction. The concept of "one small step for man, one giant leap for mankind" has evidenced itself for both good and evil in our society. Dr. Leo Alexander, a professor of medicine who served as a medical consultant at the war-crimes trial of German physicians at the end of World War II, had the following to say about the atrocities perpetrated during the war:

*79 "Whatever proportions these crimes finally assumed, it became evident to all who investigated them that they had started from small beginnings. The beginnings at first were merely a subtle shift in emphasis in the basic attitude of physicians. It started with the acceptance of the attitude, basic in the euthanasia movement, that there is such a thing as life not worthy to be lived. This attitude in its early stages concerned itself merely with the severely and chronically sick. Gradually, the sphere of those to be included in this category was enlarged to encompass the socially unproductive, the ideologically unwanted, and finally all non-Germans. But it is important to realize that the infinitely small wedged-in lever from which this entire trend of mind received its impetus was the attitude toward the nonrehabilitable sick." (Emphasis added.) Alexander, Medical Science Under Dictatorship, 241 New Eng. J. Med. 39 (1949), as quoted in Koop, The "Small Beginnings" of Euthanasia: Examining the Erosion in Legal Prohibitions Against Mercy-Killing, 2 J.L. Ethics & Pub. Pol'y 585, 589-90 (1986).
I do not mean, by offering this quote from Dr. Alexander, to equate the decision before this court in any manner to the horror of decisions and actions made before and during the war. I fully recognize that we are here confronted by a loving family who is deeply concerned about a fellow family member whom they deeply love. However, an action taken by this court affects more than Mrs. Longeway. Every step taken in a certain direction does have a profound effect for those who follow. The direction which the people of this State ought to go must be based on more in-depth analysis than is possible for a court of law.
For these reasons alone I would vehemently dissent from the majority opinion; however I must continue by addressing other issues raised in the majority opinion which are based on faulty reasoning and which so utterly fail to recognize an already established State policy. The majority points to eight State courts which have addressed *80 the issue of removal of nutrition and hydration (133 Ill.2d at 38). I note that of those cases listed, only six are by that State's highest court. My research indicates, however, that the highest court of Connecticut has also recently addressed the issue, thus bringing the number of high court decisions to seven. We are faced here with a life and death matter. Certainly it cannot be denied that excellent opinions are issued from intermediate courts of appeal in every State; however, when dealing with a matter of such import I cannot understand reliance by my colleagues on decisions reached by intermediate courts in California, New York and Florida. To attempt to persuade by the mere use of numbers, and then allude to "consensus," seems to me a fatuitous attempt at justification. While the impassioned plea of "But everyone is doing it" may sway some, I am not moved. More than a surface examination of each particular case and that State's public policy or statutory position out of which the decision evolved is demanded, especially when dealing with a life and death issue.
When faced with a case of first impression, our court has in the past looked to decisions of sister States. This process is not to facilitate an engagement in a game of "Follow the Leader," but to assist the court by allowing for an analysis of other approaches and reasoning in arriving at our own independent decision. I do not believe that in this case it is necessary to look at what other States are doing. As I have already discussed, our legislature has already begun the process of addressing this issue. It is for this State alone to determine what is best for its residents based on our own enunciated public policy. However, because the majority has relied on decisions reached by other courts, I examine these cases more closely in order to point out the fallacy of their use here. I limit my discussion to decisions rendered by a State's highest court which specifically address the issue *81 of withdrawal of nutrition and hydration from an incompetent person.
I initially look to New Jersey, the first State supreme court which addressed the issue of withdrawal of nutrition and hydration. In In re Conroy (1985), 98 N.J. 321, 486 A.2d 1209, the court was confronted with a nephew's request to remove an incompetent 84-year-old nursing home resident from a nasogastric tube. Claire Conroy was not brain dead, comatose, or in a chronic vegetative state. The court framed the issue before it as one of determining "the circumstances under which life-sustaining treatment may be withheld or withdrawn from [an] incompetent, institutionalized, elderly patient[] with severe and permanent mental and physical impairments and a limited life expectancy." (98 N.J. at 335, 486 A.2d at 1216.) The New Jersey Supreme Court found that, based on a competent adult's common law right to self-determination, life-sustaining treatment may be withheld or withdrawn from an incompetent patient when it is clear that the particular patient would have refused the particular treatment involved under the circumstances (the "subjective test"). Life-sustaining treatment may also be withheld or withdrawn if either of two "best interests" test  a "limited-objective" or "pure-objective" test  is satisfied, the court held. However, based on the record before the court, and with the knowledge that Claire Conroy had already died, the court determined that had she been alive she would not have met the test that they set out and would have had to remain connected to the nasogastric tubes.
Why did the New Jersey court base their decision on the common law? Simple! The State had no legislation which even peripherally addressed the termination of medical treatment. (98 N.J. at 344 n. 2, 486 A.2d at 1220 n. 2.) The court recognized, however, that the legislature was the more appropriate agency to address the issue:

*82 "As an elected body, the Legislature is better able than any other single institution to reflect the social values at stake. In addition, it has the resources and ability to synthesize vast quantities of data and opinions from a variety of fields and to formulate general guidelines that may be applicable to a broad range of situations." (98 N.J. at 344, 486 A.2d at 1221.)
The court concluded, however, that "in the absence of specific legislation on the termination of life-sustaining treatment, we may not properly avoid the issue * * *." (98 N.J. at 345, 486 A.2d at 1221.) The court had only the common law on which to base their decision. Without any legislative enactment indicating a limitation or extension of the common law, the court was limited in their review. The legal reality faced by the New Jersey court was vastly different than our own present situation in Illinois.
Two years later the New Jersey Supreme Court was again faced with issues relating to termination of medical care. Although a trilogy of cases addressing termination of treatment were released on the same day, only one is of particular interest here. In re Jobes (1987), 108 N.J. 394, 529 A.2d 434, involved a husband's petition to remove a life-sustaining nutrition system from his comatose, 31-year-old wife who was residing in a nursing home. Because the incompetent patient had "failed to express adequately her attitude toward such treatment," the court was left to "determine who decides for the incompetent patient, the standard that the surrogate decisionmaker must use." (108 N.J. at 399, 529 A.2d at 436.) As was the case in Conroy, the court had to make this decision without the benefit of any legislative guidance.
In reaching a decision, the court described the patient's condition at length. Justice Handler, in a concurring opinion, summarized the patient's condition with the following description:

*83 "To summarize, Mrs. Jobes' physical condition is extreme: major organs and systems have failed; she is profoundly comatose; her body has atrophied, contracted and deteriorated; she is totally incontinent. Her treatment is overwhelmingly burdensome and intrusive: she has been repeatedly hospitalized for more extended, extraordinary medical treatment; she requires two surgically-implanted devices; she must be evacuated and irrigated; she must be handled constantly and prevented from self-mutilation. Her prognosis is hopeless; she cannot live without massive, extraordinary medical and health care measures." (108 N.J. at 442, 529 A.2d at 459 (Handler, J., concurring).)
In finding that the right of such an irreversibly comatose patient to refuse life-sustaining medical treatment may be exercised by the patient's family under certain conditions, the court was painfully aware that "[t]hese considerations, spanning difficult individual and societal interests, argue forcefully for legislative intercession and resolution. In the meantime, the Court cannot responsibly evade its own duty * * *." 108 N.J. at 447, 529 A.2d at 461 (Handler, J., concurring).
Why is the legislature better suited to resolve these matters? Jobes addresses that very issue:
"It is important to acknowledge that the inquiry posed by these appeals has as much to do with judicial attitudes as with judicial decisions. The emotional power of the right-to-die cases comes in part from our ability to identify with the actors in the legal drama. [Citation.] Judges as individuals bring to bear their own personal experiences and feelings to these cases and to the various parties involved  the patient, the family, the friends, the doctors and other health care providers. Because we identify with the actors, judges may by their own experiences be pulled too deeply into the drama of the situation.
There is some justified belief that judges cannot in these cases achieve evenhandedness and impartiality. [Citation.]" *84 108 N.J. at 445, 529 A.2d at 460 (Handler, J., concurring).
My research indicates that, to date, New Jersey has no legislative enactments affecting an individual's rights to terminate treatment. Unlike our State, New Jersey has not enacted a living will statute protecting the rights of even a competent individual to refuse treatment, nor has the State defined such terms as "life-sustaining procedure" or "death-prolonging procedure" in any other legislation.
While I jumped the time sequence above in order to discuss the New Jersey Jobes case, following Conroy, the Massachusetts Supreme Court was the next to address the issue of termination of treatment. Brophy v. New England Sinai Hospital, Inc. (1986), 398 Mass. 417, 497 N.E.2d 626, concerned a wife's petition to remove or clamp her husband's nasogastric tube. The court found that "Brophy is now in a condition described as a `persistent vegetative state.'" (398 Mass. at 421, 497 N.E.2d at 628.) In a decision based on both the common law and constitutional law, the court held that, because "Brophy's judgment would be to decline the provision of food and water and to terminate his life" (398 Mass. at 427, 497 N.E.2d at 631), a theory of substituted judgment would permit the treatment to be discontinued.
As becomes clear when reviewing the termination cases, these are extremely difficult cases and are not conducive to a unanimous disposition. Brophy, like the case now before this court, was not a unanimous decision. Three separate and impassioned dissents were written. One justice indicated that the majority opinion "affront[ed] logic, ethics, and the dignity of the human person" by "endors[ing] euthanasia and suicide." (398 Mass. at 442, 497 N.E.2d at 640 (Nolan, J., dissenting).) Another justice indicated that his principal objection *85 was that "the State's interest in the preservation of life has not been given appropriate weight." (398 Mass. at 443, 497 N.E.2d at 640 (Lynch, J., dissenting in part).) There is, he concluded, "no rational distinction between suicide by deprivation of hydration or nutrition in or out of a medical setting  both are suicide." (398 Mass. at 447, 497 N.E.2d at 643 (Lynch, J., dissenting in part).) In rejecting the majority's conclusion that nutrition and hydration could be withdrawn, a third justice argued that
"[e]ven in cases involving severe and enduring illness, disability and `helplessness,' society's focus must be on life, not death, with dignity. By its very nature, every human life, without reference to its condition, has a value that no one rightfully can deny or measure. Recognition of that truth is the cornerstone on which American law is built. Society's acceptance of that fundamental principle explains why, from time immemorial, society through law has extended its protection to all, including, especially, its weakest and most vulnerable members. The court's implicit, if not explicit, declaration that not every human life has sufficient value to be worthy of the State's protection denies the dignity of all human life, and undermines the very principle on which American law is constructed." 398 Mass. at 453, 497 N.E.2d at 646 (O'Connor, J., concurring in part & dissenting in part).
To the extent that Brophy was decided on constitutional grounds, the majority's reasoning is not applicable to the case before us. To the extent that its decision is based on the common law, I note that, like New Jersey, there were no legislative enactments addressing the issue of termination of treatment for competent patients or for incompetent patients, no legislatively defined terms. My current research indicates that Massachusetts still has not enacted any legislation which would stipulate the public policy of the State in regards to termination of medical procedures or define such terms as "life-sustaining *86 procedure." While I appreciate the difficult task the supreme court of Massachusetts faced, I cannot accept that a vehemently contested case in a State whose statutory position is vastly different than our own has any reasoning to offer that must be construed by this court as "persuasive."
The supreme court of Maine was the next State high court to address the issue of removal of nutrition and hydration from an incompetent patient. In re Gardner (Me. 1987), 534 A.2d 947, like Brophy, was a 4-3 decision with a strong dissent. Joseph Gardner, at approximately 23 years of age, suffered permanent and totally disabling injuries to his head when he fell from the back of a moving truck. The court described him as being in a chronic and persistent vegetative state, though not terminally ill; moreover, he showed no evidence of any thought process, emotion or pain. As the supreme court of Maine noted, the trial court found that, prior to his accident, Gardner had "declared his `intent and desire that he not be maintained on the nasogastric tube'; that he would rather die than be maintained in a persistent vegetative state by artificial means." 534 A.2d at 949.
The Gardner majority based its decision to allow the removal of the feeding tubes on the common law right to refuse treatment, citing particularly to the precedents set by Massachusetts and New Jersey decisions which I discussed above. (534 A.2d at 951-52.) A major point of contention between the majority and the dissenters' interpretations of the law revolved around the import accorded the State's living will legislation, which "narrowly defined the life-sustaining procedures that could be discontinued under the Act to exclude nutrition and hydration." (534 A.2d at 952 n. 3.) The majority determined that the limitation in the living will legislation did "not limit our power to read more broadly under Maine common law the right of a patient to make decisions *87 concerning life-sustaining care." (534 A.2d at 952 n. 3.) The majority did not rely on a theory of substituted judgment but rather on Gardner's own clearly enunciated personal judgment. The majority found by clear and convincing evidence that Gardner had "before his terrible accident * * * made his pertinent wishes well known." (534 A.2d at 950.) Because Gardner's personal intent was clear, and because he had not executed a living will, the court was not bound by the same limitations as would be faced by a competent individual who had a valid living will.
The dissent, in rejecting the majority's analysis, recognized that the Maine legislature had specifically treated nutrition and hydration differently than other life-sustaining procedures under the Maine Living Will Act (22 M.R.S.A. § 2921(4) (Supp. 1987)): "[t]his legislative enactment reflects the value placed on life and the significance of food and water to our survival." (534 A.2d at 958 (Clifford, J., dissenting).) The State has, the dissenters indicated, "an interest in preserving the life of Joseph Gardner as an individual and in preserving life in general. [Citation.] This interest in preserving life derives from our instinct for self-preservation and is essential to our survival as a civilization." 534 A.2d at 957 (Clifford, J., dissenting).
Maine's Living Will Act defines a life-sustaining procedure as "any medical procedure or intervention that, when administered to a qualified patient, will serve only to prolong the dying process and shall not include nutrition and hydration." (Me. Rev. Stat. Ann. tit. 22, § 2921(4) (Supp. 1988).) Rather than analyze its own internal State policies, however, the Maine majority searched for support in the common law of fellow States, States which did not have such legislative indications of policy. While I would find this error fatal, as I do with the instant case, I also note that Gardner is distinguishable *88 both in the exactness of Maine's legislative language and in the court's finding by "clear and convincing" evidence that the individual did not desire to be so maintained.
Washington's Supreme Court addressed the issue of continued medical treatment for a terminally ill 22-year-old woman who was suffering from Batten's disease and who had been declared an incompetent at the age of 14. In re Guardianship of Grant (1987), 109 Wash.2d 545, 747 P.2d 445, was a 5-4 decision; the two separate dissents each disagreed with the majority's reasoning regarding its allowance of a refusal of nutrition and hydration.
Batten's disease is a "genetic, neurological, degenerative condition of the central nervous system. There is no known cure. Most victims die in their teens or early twenties." (109 Wash.2d at 547, 747 P.2d at 446.) The court further described the disease as follows:
"Victims of the disease usually start life as normal appearing children. The first symptom is a problem with vision, followed by epileptic seizures and a loss of motor control which causes the child to stagger. Later, the child has speech difficulties. Eventually the child can no longer walk or talk and is completely blind. Batten's disease also causes severe mental retardation, with intellectual functions progressively failing. The child develops difficulty with swallowing, caused by a loss of voluntary muscle control. Brain control of the heart and lungs deteriorates, initially causing irregular heart rate and breathing, and finally, cardiac or respiratory arrest. Ultimately the child's vital functions fail, resulting in death." (109 Wash.2d at 547-48, 747 P.2d at 446.)
Expert witnesses and caregivers testified that "Barbara is in the terminal stages of the disease and `in an almost vegetative state with little if any response to human contact.'" 109 Wash.2d at 550, 747 P.2d at 447-48.
*89 The case arose when Barbara's mother, her guardian, petitioned the court for an "`Order authorizing the withholding of life support systems.'" (109 Wash.2d at 550, 747 P.2d at 448.) In her brief, Barbara's mother indicated that the envisioned order would encompass any potential cardiac or respiratory problems as well as the loss of ability to swallow. Because Barbara had never been a competent adult capable of executing a living will under the State's Natural Death Act (Wash. Rev. Code § 70.122 (Supp. 1989)), provisions of that legislation were not applicable. Washington's Natural Death Act defines life-sustaining procedures as:
"any medical or surgical procedure or intervention which utilizes mechanical or other artificial means to sustain, restore, or supplant a vital function, which, when applied to a qualified patient, would serve only to artificially prolong the moment of death and where, in the judgment of the attending physician, death is imminent whether or not such procedures are utilized. `Life-sustaining procedure' shall not include the administration of medication or the performance of any medical procedure deemed necessary to alleviate pain." Wash. Rev. Code § 70.122.020 (Supp. 1989).
Because the provisions of the statute did not apply, the majority found that Barbara had a right to refuse treatment based on a constitutional right of privacy and on the common law. (109 Wash.2d at 553, 747 P.2d at 449.) We look only at the court's common law rationale here. While the court fairly quickly addressed the issue of withholding resuscitation procedures, the court went to greater lengths to address the withholding of nutrition and hydration. (See 109 Wash.2d at 559-65, 747 P.2d at 452-55.) The majority relied on New Jersey's Conroy and intermediate court decisions in California and Florida to support their conclusion that nasogastric *90 feeding could not be distinguished from an artificial respirator and thus could be withheld.
It is this last point with which the dissenters most ardently disagreed, as noted in one of the separate opinions:
"I disagree, however, with the majority's further decision which allows the patient's life to be taken by withholding intravenous nutrition and hydration or, to use less polite phraseology, to let her die of thirst or starvation. Call it whatever the majority will, this is pure, unadorned euthanasia. It is a step upon a slippery slope, one that I would not take. If mores have changed to the extent that such conduct can now be sanctioned, I would let that change arrive through the moral judgment of the people as expressed through their duly elected legislators, not by the expedience of judicial fiat." 109 Wash.2d at 570, 747 P.2d at 458 (Andersen, J., concurring in part & dissenting in part).
In another separate dissent the majority opinion was characterized as "in direct conflict with this court's duty to preserve life." (109 Wash.2d at 575, 747 P.2d at 460 (Goodloe, J., dissenting).) Additionally, by allowing nutrition and hydration to be withheld, "the majority authorizes death by starvation and dehydration," an authorization which "for all intents and purposes * * * authorizes mercy killing, arguably of a cruel nature." (109 Wash.2d at 576, 747 P.2d at 461 (Goodloe, J., dissenting).) The dissent further characterized the majority's decision as an extension of a legislative act, an extension which, after several attempts in the legislature, the legislature itself had not as yet seen fit to make. (109 Wash.2d at 577-80, 747 P.2d at 462-63 (Goodloe, J., dissenting).) As the dissent noted, "[t]he failure of the Legislature to extend the [Natural Death Act] demonstrates that, unlike the majority, the Legislature is having a difficult time determining the extent of authority which guardians ought to have in deciding matters of life and death for *91 their wards." (109 Wash.2d at 579, 747 P.2d at 463 (Goodloe, J., dissenting).) In concluding this discussion of the Washington court's opinion, I note that Washington's living will legislation is much different than Illinois' in that Washington's legislation does not exclude nutrition and hydration from its definition of "life-sustaining treatment" that may be withheld. Thus, unlike a competent individual in Illinois, a competent adult in Washington could refuse nutrition and hydration even if death would result from starvation and dehydration.
New York's highest court was the next to issue a decision about the withdrawal of nutrition and hydration in In re O'Connor (1988), 72 N.Y.2d 517, 531 N.E.2d 607, 534 N.Y.S.2d 886. While the court refused to allow the withdrawal of nutrition and hydration, O'Connor provides a further example of a case in which this issue seriously divides a court. O'Connor involved an elderly hospital patient who, as a result of several strokes, was left mentally incompetent. Her daughters sought to prevent the insertion of a nasogastric tube to provide nutrition and hydration to the patient based on O'Connor's statements to the effect that she did not want to be a burden to anyone.
New York, like New Jersey and Massachusetts, has no legislation authorizing the execution of a living will; however, the New York legislature has enacted a law, effective April 1, 1988, which allows third parties to issue a "Do Not Resuscitate" order for incompetent patients under certain limited circumstances. (N.Y. Pub. Health Law §§ 2960 through 2978 (McKinney Supp. 1989).) Because there were no statutory provisions which addressed the issue of nutrition and hydration, the court looked solely to the common law of the State. In fashioning a test, based on the common law right of an individual to refuse treatment, the court extended, to a limited degree, the rights of the competent which may be applied *92 on behalf of the incompetent. The devised test requires that the trial court determine by "clear and convincing evidence" that the now incompetent individual would have refused the specific treatment involved. Such a strict standard was required, the court reasoned, to ensure that any error, should one occur, "should be made on the side of life." (72 N.Y.2d at 531, 531 N.E.2d at 613, 534 N.Y.S.2d at 892.) O'Connor had not made such clear and convincing statements which would indicate that she intended to refuse nutrition and hydration; thus, the court determined, O'Connor must continue to be fed.
A concurring opinion, submitted by one justice, was filed. The concurring opinion called for a change in the present New York rule to assist in future decisions which may "involv[e] circumstances more extreme than those presented here." (72 N.Y.2d at 535, 531 N.E.2d at 616, 534 N.Y.S.2d at 895 (Hancock, J., concurring).) However, the justice noted that "[t]he particular circumstances here  e.g., the patient is neither terminal, comatose nor vegetative; she is awake, responsive and experiencing no pain; and the prescribed procedure is relatively simple and routine  [] weigh heavily in favor of continuing the medically-assisted feeding under any of the approaches adopted by other State courts or recommended in the pertinent literature." 72 N.Y.2d at 535, 531 N.E.2d at 616, 534 N.Y.S.2d at 895 (Hancock, J., concurring).
The dissent in O'Connor appeared to recognize that, based on established law in New York, the majority's decision was correct; however, the dissent argued that "simple decency requires that a remedy be found" and that the court should "provide relief" by broadening New York's limited rule. Following an extensive description of O'Connor's physical condition, the dissent indicated that the test devised by the majority, that is, the clear and convincing test, was "unworkable because it *93 requires humans to exercise foresight they do not possess." (72 N.Y.2d at 549, 531 N.E.2d at 625, 534 N.Y.S.2d at 904 (Simons, J., dissenting).) Rather, the dissent would find that O'Connor had "expressed her wishes in the only terms familiar to her, and she expressed them as clearly as a lay person should be asked to express them." (72 N.Y.2d at 551, 531 N.E.2d at 626, 534 N.Y.S.2d at 905 (Simons, J., dissenting).) In fashioning a decision for our State, O'Connor can be given no more weight than Conroy, Jobes or Brophy, as already discussed above.
In Cruzan v. Harmon (Mo. 1988), 760 S.W.2d 408, Missouri's highest court, like New York's, refused to allow nutrition and hydration to be withheld from an incompetent ward who was in a persistent vegetative state and not terminally ill. (Cruzan, 760 S.W.2d at 411-12.) In denying the co-guardians' request to terminate treatment, the court noted:
"This is * * * a case in which euphemisms readily find their way to the fore, perhaps to soften the reality of what is really at stake. But this is not a case in which we are asked to let someone die. Nancy is not dead. Nor is she terminally ill. This is a case in which we are asked to allow the medical profession to make Nancy die by starvation and dehydration. The debate here is thus not between life and death; it is between quality of life and death. We are asked to hold that the cost of maintaining Nancy's present life is too great when weighed against the benefit that life conveys both to Nancy and her loved ones and that she must die." (760 S.W.2d at 412.)
In refusing to find the cost too great, the court stressed the State's interest in preserving life, an interest which encompasses both "the prolongation of the life of the individual patient and an interest in the sanctity of life itself." (760 S.W.2d at 419.) The court looked to the State's policy "strongly favoring life" (760 S.W.2d at 419) embodied in the State living will statute.
*94 Support is found for denying the withdrawal of nutrition and hydration, the court indicated, in the legislature's definition in the Living Will Act of "death-prolonging procedure":
"any medical procedure or intervention which, when applied to a patient, would serve only to prolong artificially the dying process and where, in the judgment of the attending physician pursuant to usual and customary medical standards, death will occur within a short time whether or not such procedure or intervention is utilized. Death-prolonging procedure shall not include the administration of medication or the performance of medical procedure deemed necessary to provide comfort care or to alleviate pain nor the performance of any procedure to provide nutrition or hydration." (Mo. Rev. Stat. § 459.010(3) (1986).)
The import of the statute is not that its provisions were here applicable, the court concluded, but rather that it contains an "expression of the policy of this State with regard to the sanctity of life." 760 S.W.2d at 420.
The Cruzan court noted that a common law right to refuse treatment is not absolute, it must be balanced against the State's interest in life. That interest is not in the quality of life, but is "an unqualified interest in life." (760 S.W.2d at 422.) Based on the State's strong policy favoring life, the majority concluded:
"We believe that policy dictates that we err on the side of preserving life. If there is to be a change in that policy, it must come from the people through their elected representatives. Broad policy questions bearing on life and death issues are more properly addressed by representative assemblies. These have vast fact and opinion gathering and synthesizing powers unavailable to courts; the exercise of these powers is particularly appropriate where issues invoke the concerns of medicine, ethics, morality, philosophy, theology and law. Assuming change is appropriate, this issue demands a comprehensive resolution which courts cannot provide." 760 S.W.2d at 426.
*95 Three separate dissenting opinions were filed in this case. The dissenters did not agree with the emphasis that the majority placed on the State's interest in life; would rather have given greater credence in this case of first impression to decisions rendered by other State courts; and would rather have waited to render a decision without the assistance of a "special judge."
In looking at and reviewing the cases, it is interesting to note that Missouri's statutory position is similar to ours in Illinois.
One last case, not cited by the majority, is Connecticut's McConnell v. Beverly Enterprises-Connecticut, Inc. (1989), 209 Conn. 692, 553 A.2d 596. The McConnell case was initiated on behalf of a "patient who is presently in a terminal coma, to implement the patient's clearly expressed wish for the removal of a gastrostomy tube that is artificially providing nutrition and hydration." (209 Conn. at 695, 553 A.2d at 598.) The patient here in question was a registered nurse who had "expressly and repeatedly told her family and her co-workers that, in the event of her permanent total incapacity, she did not want to be kept alive by any artificial means, including life-sustaining feeding tubes." 209 Conn. at 696, 553 A.2d at 599.
The court in McConnell approved the removal of nutrition and hydration tubes by construing the provisions of the State's "Removal of Life Support Systems Act" (Conn. Gen. Stat. § 19a-570 et seq. (Supp. 1989)). The act defines a life-support system which may be removed pursuant to its provisions as "any mechanical or electronic device, excluding the provision of nutrition and hydration, utilized by any physician or licensed medical facility in order to replace, assist or supplement the function of any human vital organ or combination of organs and which prolongs the dying process." (Conn. *96 Gen. Stat. § 19a-570(1) (Supp. 1989).) By construing this provision in conjunction with another statutory provision which the court determined distinguished "beneficial medical treatment" as distinct from "nutrition and hydration" (see Conn. Gen. Stat. § 19a-571 (Supp. 1989)), the court concluded that the act "implicitly contemplates the possible removal from a terminally ill patient of artificial technology in the form of a device such as a gastrostomy tube, but it does not, under any circumstances, permit the withholding of normal nutritional aids such as a spoon or a straw." (209 Conn. at 705, 553 A.2d at 603.) Four justices comprised the majority.
A concurring opinion submitted by one justice disagreed with the majority's interpretation of the statute; rather, the justice determined, the decision should be based on the common law.
I am left to wonder what Connecticut's majority would have classified as "normal nutritional aids" had the decision been written in 1885, the year before the drinking straw was first marketed. And what would have been "normal" before the advent of the spoon? Are such life and death matters to be decided on the basis of distinguishing what is "normal" and what is not at a particular point in time? I cannot fathom that such rationalization is adequate in deciding who shall live and who shall die. Such an interpretation of statutory language, in my mind, defies logic!
Thus, by my analysis, that long list of cases decided in sister States which the majority offered as applicable to our situation in Illinois has been whittled down to two cases: Maine's In re Gardner (Me. 1987), 534 A.2d 947, and Missouri's Cruzan v. Harmon (Mo. 1988), 760 S.W.2d 408. Both cases were vehement 4-3 decisions, yet each reached a different conclusion. Gardner's majority relied solely on the common law, as enunciated and highlighted by two prior decisions from States which did not *97 have any pertinent legislation, to allow withdrawal of nutrition and hydration from an incompetent patient who had clearly indicated that he did not wish to be maintained on a nasogastric tube; the dissenters decried the majority's refusal to look within their own State's statutory background and policy for guidance. Cruzan's majority, in denying the petition to withdraw nutrition and hydration, based their decision on the State's public policy as enunciated in their living will act.
Whose reasoning is more persuasive? This certainly does not form the great "consensus" that the majority alluded to. Were we to look at the record before us, a record which does not present a picture of a patient who clearly and convincingly indicated that she would refuse the nutrition and hydration as did the patient in Gardner, we are left only with the Cruzan decision.
It is obvious that the question of who may make decisions for incompetent patients, and to what degree a third party may go in making those decisions, is a question that is of vital importance to the citizens of this State. Not only in the case before our court, but in a myriad of situations in hospitals across our State, individuals are seeking guidance as they confront the most heartrending physical conditions. I am not unaware of the pain experienced by family members as they watch and experience the slow death of their loved ones. I dissent from the majority opinion precisely because the question is of such vital importance to our society; this is not a decision for our court to be making.